James Ross and Ann Ross v. Commissioner. Neil Sullivan and Grace Sullivan v. Commissioner.
Ross v. Commissioner
Docket Nos. 48593, 48594.
United States Tax Court
T.C. Memo 1956-5; 1956 Tax Ct. Memo LEXIS 291; 15 T.C.M. (CCH) 23; T.C.M. (RIA) 56005; January 13, 1956
*291 During the taxable years 1948, 1949 and 1950, James Ross and Neil Sullivan were equal partners operating an illegal bookmaking business in Chicago, Illinois. In those years, the partnership returns disclosed, respectively, gross profits of 6.86 per cent, 6.46 per cent and 5.56 per cent of total bets received. In his statutory notice of deficiency, respondent accepted the accuracy of the reported gross receipts and operating expenses, but disallowed the deduction of "pay outs" in excess of 86 per cent of amounts wagered. Respondent thereafter, in his amended answer, asserted additional deficiencies based upon the claim of illegality of payments for wages and rent in the conduct of a bookmaking business in the State of Illinois. Fraud was not alleged, and there was no evidence of fraud in the record. There was, however, no practical way for respondent to verify the correctness of petitioners' books and records by independent check, especially as to "pay outs" to winning bettors. Held, (a) Respondent's disallowance of a portion of claimed "pay outs" disapproved where calculated upon a ratio determined on the basis of data unrelated to petitioners' business or similar businesses. *292 (b) Respondent sustained in disallowing deductions for wages and rent paid in violation of Illinois law in the conduct of a bookmaking business. (c) Penalties are allowed under sections 294(d)(1)(A) and 294(d)(2) of the Internal Revenue Code of 1939. Penalties under 293(a) are disallowed. E. J. Blair, Esq., for the petitioners. George T. Donoghue, Jr., Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion These are consolidated proceedings in which the respondent determined deficiencies in income taxes and penalties as follows: Sec. 294
Sec. 294
Sec.
(d)(1)(A)
(d)2)
293(a)
Petitioners
Year
Tax
Deficiency
Penalty
Penalty
Penalty
James Ross & Ann Ross
1948
Income
$13,407.14
$ 670.36
$1,593.28
$ 955.97
James Ross & Ann Ross
1949
Income
15,429.66
771.48
1,741.16
1,044.69
James Ross & Ann Ross
1950
Income
22,383.98
1,119.20
2,437.42
1,462.45
Neil Sullivan & Grace
1948
Income
13,254.02
662.70
1,562.13
937.28
Sullivan
Neil Sullivan & Grace
1948
Income
15,255.36
762.77
1,709.99
1,025.99
Sullivan
Neil Sullivan & Grace
1950
Income
21,990.86
1,099.54
2,369.71
1,421.83
Sullivan
Respondent claimed increased deficiencies in the amendments to his answers as follows: Sec.
Sec. 294
294(d)
Sec.
(1)(A) [1]
(d)(2)
293(a)
Petitioners
Year
Tax
Deficiency
Penalty
Penalty
Penalty
James Ross & Ann Ross
1948
Income
$7,403.52
$370.17
$740.36
$444.21
James Ross & Ann Ross
1949
Income
8,726.26
436.32
872.60
523.57
James Ross & Ann Ross
1950
Income
9,583.78
479.19
575.03
958.38
Neil Sullivan & Grace
1948
Income
7,387.68
369.39
738.77
443.26
Sullivan
Neil Sullivan & Grace
1949
Income
8,694.64
434.73
869.45
521.68
Sullivan
Neil Sullivan & Grace
1950
Income
9,517.70
475.89
951.77
571.06
Sullivan
*294 The issues presented involve: (a) Disallowance by formula of a percentage of "pay outs" to winning bettors claimed to have been made by a partnership of bookmakers; (b) Disallowance of deductions for wages and rent paid by bookmakers in violation of Illinois law. (c) Application of penalties under sections 293(a); 294(d)(1)(A); and 294(d)(2) of the Internal Revenue Code of 1939. Findings of Fact The petitioners James Ross and Ann Ross are individuals with residence at 3520 Lake Shore Drive, Chicago, Illinois. Their joint Federal income tax returns for the calendar years 1948, 1949 and 1950 were timely filed with the then collector of internal revenue for the first district of Illinois. The petitioners Neil Sullivan and Grace Sullivan are individuals with residence at 5151 Kenmore Avenue, Chicago, Illinois. Their joint Federal income tax returns for the calendar years 1948, 1949 and 1950 were timely filed with the then collector of internal revenue for the first district of Illinois. During the taxable years in question, petitioners James *295 Ross and Neil Sullivan were equal partners engaged in the bookmaking business in Chicago, Illinois. Each of them invested a few hundred dollars as the original capital of the partnership. During the taxable years, the business of the partnership was conducted in various leased rooms on the upper floors of a hotel located at 411 South Wabash Avenue, in the central business district of Chicago. Customers of the partnership were usually directed to its place of business in the hotel by one of its employees or by other customers. The partnership accepted bets from various individuals and agreed to pay the bettor if he won his bet, such odds as were shown by the pari-mutuel machines of the various race tracks located in different parts of the country, with the limitation, that in no event would it pay more than $30 for $1.00, in respect of "win," $12 for $1.00 in respect of "place," and $6.00 for $1.00 in respect of "show." To win a "win" bet the horse wagered on must come in first; to win a "place" bet the horse wagered on must come in first or second; and to win a "show" bet the horse wagered on must come in first second or third. To win a daily double bet, the bettor must select in *296 advance the winning horses in two races at a particular track, usually the first and second races. Parlay bets are similar to daily double wagers, except they may be made to win, place or show, and may be made on two or more horses at the same or different tracks. Like daily double bets the horses must be selected in advance, and all must win, place or show, depending on how they were bet to finish. A "scratch" occurs when a horse entered in a race is withdrawn shortly before the running of the race. "Scratches" on which the partnership had accepted wagers did not occur in substantial number during the course of a year. In the case of a "scratch," the wager was returned to the bettor, and the repayment was recorded on the partnership records as an "out" in the same amount as the wager. The bets placed by patrons of the partnership were recorded on printed forms known as safety tickets, the originals of which were given to the patrons, and the carbon copies of which were retained by the partnership. These safety tickets were printed in duplicate in books of ten pages with twenty tickets to a page, each ticket bearing a printed number. On these safety tickets in the spaces provided *297 for the purpose, was written the information containing the number of the horse, the kind of the bet, such as "win," "place" or "show," et cetera, and the amount of the bet. A large cardboard sheet, commonly called a hard card, for each track was hung on the wall in the partnership's place of business each day. The hard card showed the entries for the day, the jockeys and probable odds. Each horse was shown by name and number and the number corresponded to the number written in on the safety ticket when a bet was made on the horse. The partnership subscribed to a wire service which gave information over a loud speaker such as the time when the race commenced, the progress of the race until it ended, the result, and then the odds payable at the track to the winners of win, place and show bets on the basis of $2.00 bets. A winner was required to present the original ticket to collect his wager. When a winner presented the original, it was checked against the carbon copy of the partnership, and if the carbon copy showed it to be a winning ticket the notation of the amount payable was entered thereon and the bettor was paid according to the amount of the wager and the odds at the track *298 at which the horse ran, subject to the limitations in amount set forth above. At the close of each day the partnership totaled the sum shown as wagered, i.e., "ins," and the sums shown as payable to winning wagerers, i.e., "outs," as they appeared on its records. These totals, together with its various expenses, were entered on a daily summary sheet. This daily summary sheet was sent to the accountant employed by the partnership. The partnership did not preserve the original safety tickets presented by winning patrons for the years in question. It did preserve the carbon copies of the safety tickets for each day of operation and the daily summary sheets which were made from these carbon copies. Each day the partnership placed within the folded hard cards the carbon copies of the safety tickets, together with adding machine tapes showing the total "ins" and the "outs." The records thus prepared and preserved were given to the accountant for the partnership, and from these he prepared monthly summary sheets. The monthly summary sheets were recapitulated and served as the basis for the preparation of the partnership's income tax returns for the years involved herein. The returns were *299 prepared on the cash receipts and disbursements basis. During the taxable years, equal cash withdrawals were made by petitioners from the partnership sometimes as often as twice a week but not less than once a month. These cash withdrawals were not recorded on the books and the records of the partnership. The partnership books and records included a cash account, and capital accounts for the partners. No bookkeeping record was made of cash withdrawals by the partners. As a result, neither the cash account nor the capital accounts were accurate during the years in question, since they were not reduced by such withdrawals. The accountant merely used them on his own initiative as in the nature of closing accounts to keep the double entry books in balance. While the accounting procedures so used were not correct or proper, they did not have the effect of distorting income. The only practical effect was to show a continuing accumulation of cash and capital which did not in fact exist. The accountant did not know the amount of cash withdrawals made by petitioners, or the actual amount of cash in the partnership at any particular time. The accountant did not make any test to ascertain *300 whether any of the "outs" shown on the partnership's records for the years involved were, in fact, amounts paid to winning bettors. He occasionally verified the arithmetical accuracy of the daily summary sheets. He was not shown the daily cash reconciliations. On frequent occasions during the taxable years, the place of business of the partnership was raided by the police. With the exception of Sundays and holidays, the partnership conducted its operations on all days during the taxable years although it stopped business before its regular closing hour on those days on which its place of business was raided by the police. It changed its rooms in the hotel from time to time because of such raids. A number of petitioners' employees were arrested as a result of said raids, but neither of the partners was ever arrested. At the time of examination, the revenue agent found that some of the pads of safety tickets were missing, and that the consecutive order of pads was not complete. He did not make any effort to ascertain how many more there might have been. He did verify, however, that the income on the partnership returns checked with the records furnished him. The pads were not necessarily *301 used in alphabetical or numerical sequences. Petitioners did not identify any of the individuals to whom the partnership paid winning bets during the taxable years, although they were questioned in this regard during the revenue agent's examination and at the hearing. In its returns, the partnership reported total "ins" and "outs," losses from "hedging" and gross profit for the years 1948, 1949 and 1950, as follows: Total "Outs" and losses
Year
Total "Ins"
from "Hedging"
Gross Profit
Percentage
1948
$ 944,295.55
$ 879,505.60
$64,789.95
6.86
1949
1,030,671.00
964,098.00
66,573.00
6.46
1950
1,197,365.10
1,130,789.00
66,576.10
5.56
Of the amounts claimed in the partnership returns as paid out on winning wagers, the respondent disallowed the following: Year
Disallowed
1948
$ 67,411.42
1949
77,660.94
1950
101,055.01
The disallowance was based upon the assumption that the "outs" approximated 86 per cent of the amounts bet, and the "outs" claimed on the partnership returns for the years in question in excess of such percentage were disallowed on this theory. At pari-mutuel racing tracks throughout the United *302 States 10 per cent to 17 per cent of all bets placed is deducted for the racing association and the taxing authorities, and the remaining 90 per cent to 83 per cent is distributed to winning bettors. Under the laws of Illinois for the years 1948, 1949 and 1950, approximately 13 per cent of every dollar bet at the tracks was deducted from the mutuel pool, part of which was retained by the racing association and part of which was paid to the State. In addition to the part retained by the racing association, it also received and retained breakage to the dime, which amounts to approximately 1 1/2 per cent of the totals wagered. The remaining 85 1/2 per cent was distributed to the winning bettors. The partnership in the conduct of its business of bookmaking paid total wages to its six or seven employees and deducted them in its returns for the taxable years as follows: Year
Wages
1948
$18,950.00
1949
22,935.00
1950
23,390.00 The services of the employees for these wages were performed in the operation of the bookmaking business of the partnership, including the recording of bets. The partnership paid total rent to the lessor of the various hotel rooms in which *303 it conducted its business of bookmaking and deducted the rent in its returns for the taxable years as follows: Year
Rent
1948
$8,735.00
1949
9,200.00
1950
9,215.00 The lessor knowingly permitted these rooms to be used for the purposes of bookmaking. The acts performed by the employees of the partnership and the lessor in return for the wages received by the former, and the rent received by the latter, constituted violations of section 336 of the Criminal Code of the State of Illinois. The payment of said wages and rent constituted a violation of section 582 of said Code. Respondent determined penalties against petitioners for each of the years in question for failure to file declarations of estimated tax. The amounts of gross income disclosed on the returns filed by petitioners for said years were sufficient in themselves to have required petitioners to file declarations of estimated tax under the provisions of section 58 of the Internal Revenue Code of 1939. Petitioners do not deny that they failed to file such declarations of estimated tax and have presented no evidence to show that such failure was due to reasonable cause and not to wilful neglect. *304 Eighty per centum of the taxes of petitioners for each of the years in question was in excess of the estimated tax (which was zero) for each of said years. No part of the deficiency in any of the years here in question was due to negligence or intentional disregard of rules and regulations on the part of petitioners, or any of them. Opinion FISHER, Judge: This is another bookmaker case, quite similar, in many respects, to Sam Mesi, 25 T.C. - (Filed December 16, 1955). The first issue involves the disallowance by respondent of all "outs" in excess of 86 per cent of the amounts bet. The statutory notice of deficiency does not contest the accuracy of the gross receipts or the operating expenses, and does not purport to disallow any particular "outs." The disallowance of "outs" in excess of the percentage above referred to was based on a formula applied because, as the investigation agent testified in rather vague language, "the industry generally should figure on paying out about 86 per cent - $86 for every hundred dollars bet * * *". It is evident that this figure was based substantially upon the fact that lawful pari-mutuel tracks in Illinois in 1948, 1949 and 1950 distributed *305 to winning bettors 85 1/2 per cent of amounts bet. (In the United States generally, pari-mutuel race tracks distributed from 83 per cent to 90 per cent to winning bettors.) As we recognized in Sam Mesi, supra, and have held in numerous other cases, there is no relation between the amounts distributed to winners by mutuel tracks (where the track, for practical purposes is only a stakeholder) and the gross profits of a bookmaker who bets against the customer. It is apparent, therefore, that the formula on which respondent relies is here inapplicable. Respondent's statutory notice determines no fraud, mathematical inaccuracy, or specific discrepancy with respect to the "outs." This position is, in substance, that there is no practical way in which he can verify by audit the amount of the "outs," because petitioners did not require receipts for "outs" or obtain the names and addresses of winning bettors. We doubt whether such data would have been of material assistance in an audit because it is unlikely that true names and addresses would have been furnished to bookmakers. We recognize the difficulty of an effective audit, however, but we do not think the solution lies in the effort *306 to apply an unrealistic formula. Other techniques, such as the determination of income by the net worth increase method, have been developed which have been quite effective in ferreting out unreported income where the usual auditing methods are inadequate. No such method has been availed of in the instant case. The investigating agent had access to the "hard cards" and carbons of "safety tickets." It is true that he testified that some pads of "safety tickets" were missing, and some not in consecutive order but he made no effort to find out if they were in any other place, and did not indicate the extent to which they were missing or misplaced. He did not suggest that there was any indication that any of them had been destroyed. Moreover, the ledger sheets showing the posting of monthly totals were furnished to him. He testified that he verified that "the partnership returns jibed directly with the records furnished me." It is clear from the record that, assuming that the entries were honestly made, the books and records were adequate to reflect income for income tax purposes. It is true that there was no practical way to verify specific "outs." Moreover, we naturally approach *307 with suspicion any issue involving the conduct of an illegal business. Nevertheless, no fraud was alleged. The test of net worth increase was not used. Falsification of the books and records would have required collusion on the part of employees as well as the partners. No specific inaccuracies or falsifications were discovered with respect to such "outs" and no specific "outs" were disallowed. Under the circumstances, we cannot arbitrarily apply an inapplicable formula. Respondent has made no determination disallowing specific "outs" and we find no basis for determining or measuring a deficiency by disallowing a portion thereof. By the same token, we find no support in the record for application of the rule of Cohan v. Commissioner, 39 Fed. (2d) 540 (C.A. 2, 1930) to this issue, as urged by respondent. In fine, there is nothing in the case which warrants us in disregarding the "outs" as established by petitioners' books and records. The next issue concerns additional deficiencies proposed by respondent in his amended answers attributable to disallowance of wages and rent paid by the partnership. Respondent's contention is that such payments violated Illinois law, *308 and are not allowable because contrary to public policy. Section 336 of the Criminal Code of the State of Illinois provides as follows: ILLINOIS REVISED STATUTES 1945 (Burdette Smith). "336. * * * That any person who keeps any room, shed, tenement, tent, booth or building, or any part thereof, or who occupies any place upon any public or private grounds within this State with any book, instrument or device for the purpose of recording or registering bets or wagers, or of selling pools, or any person who records or registers bets or wagers, or sells pools upon the result of any trial or contest of skill, speed or power of endurance of man or beast, or upon the result of any political nomination, appointment or election, or being the owner, lessee or occupant of any room, shed, tenement, tent, booth or building, or part thereof, knowingly permits the same to be used or occupied for any of these purposes, or therein keeps, exhibits or employs any device or apparatus for the purpose of recording or registering such bets or wagers, or selling of such pools, or becomes the custodian or depository for hire or privilege, of any money, property, or thing of value staked, wagered or pledged *309 upon any such result, shall be punishable by imprisonment in the county jail for a period not longer than one year, or by fine not exceeding $2,000 or both. Provided, however, that the provisions of this act shall not apply to the actual enclosure of fair or race track associations that are incorporated under the laws of this state, during the actual time of the meetings of said associations, or within twenty-four hours before any such meetings." In addition, section 582 of the Criminal Code of the State of Illinois provides: ILLINOIS REVISED STATUTES 1945 (Burdette Smith). "582. * * * § 2. An accessory is he who stands by, and aids, abets or assists, or who not being present, aiding, abetting or assisting, hath advised, encouraged, aided or abetted the perpetration of the crime. He who thus aids, abets, assists, advises or encourages, shall be considered as principal, and punished accordingly." With respect to wages, the specific issue was before us in $2Sam Mesi, supra, which is here controlling. After a full discussion of the applicable principles and decisions relating to the disallowance of illegal expenses, we said, in part: "Pursuant to these sections of the Criminal *310 Code of the State of Illinois, the payment of the wages in question in and of itself constituted an illegal act. The wages paid by petitioner were paid to procure the direct aid of others in the perpetration of an illegal act, namely, the operation of a bookmaking establishment. Certainly, it would be a clear violation of public policy to permit the deduction of an expenditure, the making of which constitutes an illegal act." While we had no occasion to consider the question of rents in the Mesi case, we think that the principles there announced are equally applicable to rental payments on the facts presented in the instant case. It is clear that the lessor as well as the lessees were fully aware that an illegal bookmaking enterprise was being carried on upon the premises, and that both the payment and receipt of rentals were in violation of sections 336 and 582 of the Illinois Revised Statutes cited above. We hold, therefore, that the deduction of wages and rents must be disallowed. Respondent determined penalties for each of the years involved under section 294 (d)(1)(A) for failure to make and file a declaration of estimated tax. The gross income reported on the returns filed *311 by petitioners for each of the years in question was alone clearly sufficient to require the filing of such declarations under the provisions of section 58. Since petitioners do not deny that they failed to file such declarations, and since they offer no evidence to show that such failure was due to reasonable cause and not to wilful neglect, it is clear that such penalties will apply, the amount to be determined in a computation under Rule 50. A penalty for each year was likewise determined under section 294(d)(2) for substantial understatement of estimated tax. Since we have found as a fact that 80 per centum of the taxes of petitioners for each of the years in question was in excess of the estimated tax (which latter was zero, since no estimate was filed) it is again apparent that such penalties will apply. G. E. Fuller (1953) 20 T.C. 308, 316, affd. (C.A. 10) 213 Fed. (2d) 102. The amount thereof will likewise be determined under Rule 50. We take a different view, however, with respect to penalties under section 293(a). Here, penalties may be applied only if there is a deficiency, and if any part of such deficiency is due to negligence or intentional *312 disregard of rules and regulations. Since we have held that the respondent erred in disallowing any part of the "outs" deducted by petitioners, no part of any deficiencies are attributed thereto. While we have sustained respondent in the disallowance of deductions for wages and rent, we think that the state of the law on these issues was unsettled prior to our Opinion in Sam Mesi, supra, which was not published until December 16, 1955, long after the returns in issue were filed and the deductions taken. We think it is clear, therefore, that the resultant deficiencies are not to be regarded as due to any negligence or intentional disregard of rules and regulations by petitioners. We hold, therefore, that penalties under section 293(a) do not here apply. Decisions will be entered under Rule 50. Footnotes
1. These sections and the same sections on the previous page refer to the Internal Revenue Code of 1939.↩